CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 20 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| MONOGRAM SNACKS MARTINSVILLE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 4:20-cv-00030 |
| v. | ) ) | **MEMORANDUM OPINION** |
| WILDE BRANDS, INC., | ) ) ) | By:  Hon. Thomas T. Cullen United States District Judge |
| Defendant. | ) | |

Defendant Wilde Brands, Inc. ("Wilde"), a snack-food manufacturer that produces "chicken chips," entered into a business relationship with Plaintiff Monogram Snacks Martinsville, LLC ("Monogram"), one of the largest snack-food manufacturing companies in the country. Wilde sought Monogram's assistance to scale up its production and, under this arrangement, Wilde's chicken chips were mass-produced in Monogram's facility in Martinsville, Virginia ("the Martinsville facility"). Several other snack-food manufacturers also operated within the Martinsville facility. To protect Wilde's processes from those potential competitors, Wilde and Monogram entered into a non-disclosure agreement ("the NDA") on May 9, 2017. (*See* ECF No. 85-2.) The parties did not sign any other written contract with respect to their business arrangement.

But the parties' relationship soon began to sour. Monogram charged Wilde for various "true up" costs—additional expenses for, among other things, labor and maintenance that were outside of the normal cost per case of chicken chips—that Wilde had not anticipated and thought were "exorbitant." (Def.'s Br. Supp. Mot. Summ. J. at 5 [ECF No. 85].) Once

these expenses were added to the cost per case, Wilde's chicken chips were no longer profitable. At the same time, Wilde started to suspect that Monogram was not protecting its production process from its competitors, and was instead discussing its processes with and running its chip fryer in front of those competitors, in violation of the parties' NDA.

In late 2019, Wilde refused to pay several invoices from Monogram. As a result, Monogram refused to release numerous pallets of chicken chips to Wilde until the invoices were paid. On October 31, 2019, Wilde informed Monogram that it was terminating their relationship and moving its chicken chip production to another facility.

On March 2, 2020, Monogram filed a complaint against Wilde in the Circuit Court of Henry County, asserting claims for breach of contract and unjust enrichment and seeking damages to compensate for Wilde's unpaid invoices and other materials Monogram acquired for their business relationship. Wilde removed the action to this court and asserted four counterclaims: conversion, unjust enrichment, breach of contract, and misappropriation of trade secrets. This matter is now before the court on Wilde's motion for summary judgment and Monogram's motion for partial summary judgment on Wilde's counterclaim for misappropriation of trade secrets. For the reasons that follow, the court will grant in part and deny in part Wilde's motion for summary judgment and grant Monogram's motion for partial summary judgment.

## I.   BACKGROUND

Jason Wright, the founder and president of Wilde, aspired to create a protein chip made from chicken that was packaged like and resembled a potato chip. (*See* Dep. of Jason Wright 14:23–15:1, Oct. 18, 2021 [ECF No. 85-1].) In 2018 he succeeded, and Wilde launched the

"chicken chip." (*See id.*) Before the launch, Wright had started communicating with Wes Jackson, President and co-founder of Monogram, to discuss a "co-packing" relationship in which Monogram would mass-produce Wilde's chicken chips and Wilde would supply certain machinery and materials and sell and distribute the product. (*Id.* at 26:21–27:5; 24:16–24.) The parties began working together and, for over two years, Wilde paid Monogram for the production of its chicken chips and picked up its product to distribute to its customers. (Wilde Ans. ¶ 9.) Despite creating draft contracts and having discussions about memorializing their arrangement in writing, the parties never signed a written contract covering their co-manufacturing relationship. (*See* Wright Dep. at 48:5–51:16; 95:15–24.)

Throughout their relationship, which lasted approximately two years, Monogram charged Wilde "true-up costs"—flat fees for supplies, labor, and machinery—in addition to its standard cost per case for the production of chicken chips. For example, Monogram charged Wilde $100,000 to install a small test fryer in the Martinsville facility. (*Id.* at 80:4–8.) Later, when Wilde replaced the small fryer with a larger industrial fryer it had custom made, Monogram charged it $450,000 for the installation. (*Id.* at 80:16–20.) Wilde also spent $74,000 upgrading Monogram's existing bagging machine so that it would properly bag its chicken chips. (*Id.* at 88:21–89:3.) Monogram later limited Wilde's use of that machine to Fridays. (*Id.* at 88:16–23.) In response, and out of concerns that a delay in bagging would make its chicken chips stale, Wilde purchased a separate bagger for $174,000, so that it could have access to the technology whenever it needed to. (*Id.* at 88:21–89:3.)

In total, Monogram charged Wilde over $1,100,000 in true-ups including the above-mentioned expenses. (*Id.* at 53:7–12.) According to Wilde, it did not anticipate such high true-

ups. These costs drove up the cost of its chicken chips from the expected $25 per case to $38 per case. (*Id.* at 82:23–83:13.) Wilde sold its cases to customers for $33 per case, which meant the true-ups created an unsustainable situation for the company. (*Id.* at 53:11–12.)

Simultaneously, Wilde apparently began to suspect that Monogram was sharing its proprietary information with competitors or, at least, not protecting its information. Most of Wilde's production took place in a large, shared space in the Martinsville facility. (*See* Dep. of Philippe Barnoud 16:19–17:6, Oct. 19, 2021 [ECF No. 88-4]; Wright Dep. at 118:8–119:17.) Across the room from Wilde, Tyson Foods, Inc. ("Tyson") (a leading international meat-processing corporation) produced a jerky product. No physical barriers separated these operations, although each company had a distinct, separate area of the large warehouse room to run its production line. (*See* Wright Dep. at 119:11–17.) To protect Wilde's production process from competitors that used the Martinsville facility, such as Tyson and Conagra Brands, Inc. ("Conagra") (another major food processing company), Wilde drafted an NDA that Monogram signed on May 9, 2017. (*See* ECF No. 85-2.) Wilde also submitted a patent application for the top belt of its industrial fryer on May 31, 2018, to protect its custom-made design. (*See* ECF No. 88-3.) That patent application is still pending, but became public on December 5, 2019. (*Id.*)

About a year into their co-manufacturing arrangement, Wes Jackson began encouraging Wright to partner with Tyson because the company was in the process of developing its own chicken chip. (Wright Dep. at 122:9–21.) Wright declined. (*Id.*) On May 31, 2018, Tyson announced that its new chicken chip would be sold in stores that upcoming October. In July, Monogram attempted to arrange a meeting between Wright and Tyson again

to discuss "leveraging equipment to produc[e] chicken chips." (ECF No. 94-7.) Again, Wright declined. Wilde alleges that, at some point thereafter, Tyson representatives walked into its production area at the Martinsville facility late in the evening accompanied by Ches Jackson, President of Supply Chain at Monogram (and twin brother of Wes Jackson). (Wright Dep. at 117:14–118:7.) Ordinarily at that time of night no one from Wilde would have been present on the production line, but, on that occasion, Wright and Phillippe Barnoud, Vice President of Operations for Wilde, happened to be there. (*See id.* at 117:19–24; Barnoud Dep. at 17:7–23.) According to Wright, "They were as surprised to see us as . . . we were surprised to see them." (Wright Dep. at 117:21–23.) Wright alleges the Tyson representatives were trying to see inside of Wilde's fryer, but they were not successful because "[t]here was a hood on that fryer that was down and you couldn't see inside." (*Id.* at 118:14–15.)

Wilde also points to another incident when Conagra personnel allegedly entered the meat slicing room, accompanied by a Monogram employee, when Wilde personnel were slicing meat logs. (*Id.* at 115:10–116:14.) According to Wilde, Conagra could have learned proprietary information about the temperature at which it slices its meat logs by entering that room. (*Id.*) And, in what was apparently the final straw for Wilde, Monogram ran its fryer during a corporate tour of its facilities. (*See* ECF No. 94-8.) Wilde had apparently told Monogram to shut down Wilde's production line for the remainder of that week because they did not have enough meat logs to run the production line for a full day. (*See id.*) Despite this, e-mail correspondence indicates that Monogram employees ran Wilde's production line for a corporate tour without Wilde's consent. (*See id.*) These circumstances raised Wilde's suspicions that Monogram was not abiding by the NDA. (Wright Dep. at 119:18–121:13.)

In the fall of 2019, after more than two years of following this co-manufacturing arrangement, Wilde stopped paying Monogram's invoices before coming to collect the cases of chicken chips from the Martinsville facility. (*Id.* at 60:11–18; 64:7–65:11; 68:10–21.) In turn, Monogram refused to give Wilde the unpaid-for cases. (*Id.* at 96:14–98:3.) On October 31, 2019, Wilde announced that it was ending its co-manufacturing relationship with Monogram and moving its chicken chip operation to another facility in Kentucky. (ECF No. 94-9.) Since that date Monogram has held 176 pallets of Wilde's completed product and several pieces of Wilde's equipment.[1] And Wilde has not paid its outstanding invoices to Monogram.

Monogram filed a complaint against Wilde on March 2, 2020, in the Circuit Court of Henry County, asserting two counts: breach of contract (Count I) and unjust enrichment (Count II). Monogram seeks damages for Wilde's unpaid invoices and other inventory and materials Monogram acquired on Wilde's behalf—approximately $690,000 total. (*See* ECF No. 85-3, at 4–5.)

Wilde filed a notice of removal in this court and asserted four counterclaims: conversion (Count I), unjust enrichment (Count II), breach of contract (Count III), and misappropriation of trade secrets (Count IV). Wilde seeks damages in excess of $75,000 and an injunction "prohibiting Monogram from taking any action with respect to Wilde's equipment located at its Martinsville location which would result in damage to the equipment and . . . prohibiting Monogram from further disclosing Wilde's trade secrets and confidential and proprietary meat chip process information." (First Amend. Counterclaim at 12.) Wilde

---

[1] For a period of time, Monogram denied Wilde access to a high-pressure oil filter that Wilde leased from a third party, but as a result of successful negotiations between counsel, Wilde retrieved that equipment in the summer of 2021. (Wright Dep. at 91:18–92:20.)

also asks the court to issue an injunction permitting it to immediately inspect the Martinsville facility and claim immediate possession of all of Wilde's equipment at that facility.

This matter is now before the court on Wilde's motion for summary judgment on both counts in Monogram's complaint—breach of contract (Count I) and unjust enrichment (Count II)—and Monogram's motion for partial summary judgment on Count IV of Wilde's counterclaims—misappropriation of trade secrets. For the reasons that follow, the court will deny Wilde's motion for summary judgment as to Monogram's breach of contract claim and grant Wilde's motion as to Monogram's unjust enrichment claim. The court will also grant Monogram's motion for partial summary judgment as to Wilde's counterclaim for misappropriation of trade secrets.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477

U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

## III. ANALYSIS

In this diversity action, the court must apply the choice-of-law rules of the state in which it sits; in this case, Virginia. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Wilde moves for summary judgment on both counts of Monogram's complaint: breach of contract (Count I) and unjust enrichment (Count II). Monogram moves for summary judgment only

on Count IV of Wilde's counterclaims: misappropriation of trade secrets. The court will address each count and the parties' arguments pertaining to each in turn.

## A. Breach of Contract

Virginia's choice-of-law rules dictate that, in interpreting a contract, courts apply the law of the state where the contract was made. *See Lexie v. State Farm Mut. Auto. Ins. Co.*, 469 S.E.2d 61, 63 (Va. 1996). The parties agree that the discussions and negotiations giving rise to this incident occurred in Virginia and that Virginia law therefore controls.

Under Virginia law, to state a claim for breach of contract, a plaintiff must show: (1) a legally enforceable contract between the parties; (2) the defendant's violation or breach of the contract; and (3) an injury or harm to the plaintiff caused by the defendant's breach. *See Navar, Inc. v. Fed. Bus. Council*, 748 S.E.2d 296, 299 (Va. 2016). The plaintiff bears the burden of establishing that a binding and enforceable agreement exists. *See Knox Energy, LLC v. Gasco Drilling, Inc.*, 738 F. App'x 122, 124 (4th Cir. 2018) (citing *Valjar, Inc. v. Maritime Terminals, Inc.*, 265 S.E.2d 734, 736 (Va. 1980)). For a contract to be enforceable, there must be "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997).

### 1. Existence of a Contract

Wilde first argues that it did not enter into a contract with Monogram and instead, only entered into a "trial phase" to determine if the parties could establish a longer-term contract. (Def.'s Br. at 6.) In Wilde's view, the parties never had a meeting of the minds with respect to the material terms of their agreement—specifically, Monogram's pricing. Wilde also argues

that any pricing model the parties operated under was too vague or uncertain to be enforceable.

Monogram does not dispute that it did not enter into a written express contract with Wilde for the provision of co-manufacturing services. Monogram instead contends that the parties formed an oral contract. Virginia law permits parties to "agree to an express contract, whether orally or written, to govern their course of dealing." *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 772 S.E.2d 290, 293 (Va. 2015). The terms of any oral contract, like a written contract, "must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable." *Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957).

On this record, there is a genuine dispute of material fact as to whether Monogram and Wilde formed a valid oral contract with sufficiently definite terms. For over two years, Wilde placed regular orders with Monogram to produce its chicken chips. Monogram invoiced Wilde for those services, and Wilde paid those invoices. Wilde and Monogram both made substantial investments in machinery, supplies, and labor to scale up the production of chicken chips in the Martinsville facility under this agreement. Moreover, Wright testified that "[t]here was a business decision in 2018 that said that [Monogram was] going to manufacture for $25 a case" (Wright Dep. at 100:15–17), indicating the parties reached an agreement on arguably the most material contract term: price.

Even if Monogram and Wilde's co-manufacturing agreement was a precursor to the parties entering into a longer-term written agreement, the court cannot conclude that their arrangement was unenforceable as merely an "agreement to negotiate" a contract at a later

date. *See CGI Fed. Inc. v. FCi Fed. Inc.*, 814 S.E.2d 183, 188 (Va. 2018). Wilde and Monogram operated under their co-manufacturing arrangement for over two years. The record demonstrates that Wilde regularly paid invoices to Monogram for its services, and, in return, Monogram transferred possession of Wilde's product to it for distribution.

Wilde contends that this case is similar to *McKay Consulting Inc. v. Rockingham Memorial Hospital*, in which the Fourth Circuit held that no enforceable contract existed between a consulting company and a hospital because the compensation term was not readily ascertainable and the plaintiff had taken inconsistent positions on its compensation terms throughout the litigation. 452 F. App'x 331, 332 (4th Cir. 2011). But *McKay Consulting* is inapposite. In that case, the parties did not have a considerable history of operating under their agreement. Instead, the consulting company essentially pitched its services to the hospital and later sued the hospital based on an oral contract. *Id.* The hospital never made any payments to the consulting company. *Id.* Furthermore, throughout the litigation the consulting company asserted at least four different versions of what its compensation terms would be. *Id.*

In contrast, Monogram regularly invoiced Wilde for its manufacturing services—and Wilde regularly paid those invoices—for over two years. Moreover, Wright testified multiple times that the parties had agreed to produce the chicken chips for $25 a case. (*See* Wright Dep. at 50:19–22, 82:23–83:2; 100:15–17.) Wilde asserts that, once the true-ups were factored in, the overall cost to manufacture its chips was $38 per case, far exceeding $25 a case. (*Id.* at 50:19–51:2.) But this argument relates to whether or not Monogram *adhered* to the parties' agreed-upon terms, not whether the terms were ever agreed to in the first instance.

These statements and the parties' history of doing business create a triable issue of fact as to whether Wilde and Monogram agreed on the essential terms of their contract—namely price—and therefore formed a binding oral contract.

### 2. Statute of Frauds

As an alternative argument, Wilde contends that, if there was a contract between the parties, it is barred by Virginia's statute of frauds. The statute of frauds renders unenforceable any contract for the sale of goods at $500 or more unless a party can produce a "writing sufficient to indicate that a contract for sale has been made between the parties" that is "signed by the party against whom enforcement is sought." Va. Code Ann. § 8.2-201. In Wilde's view, the arrangement between it and Monogram involved the sale of goods rather than the provision of services. The court rejects this view.

When considering whether a contract is for the sale of goods or the provision of services, Virginia courts consider what the "predominate purpose" of the contract is. *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 832 (4th Cir. 1998). If the predominant purpose is the provision of services, then the statute of frauds does not apply. *Id.* A court may consider three factors to determine the predominant purpose of a contract: "(1) the language of the contract; (2) the nature of the business of the supplier; and (3) the intrinsic worth of the materials involved." *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 855 (4th Cir. 2003).

The undisputed material facts in this case demonstrate that the predominant purpose of Wilde's contract with Monogram was the provision of services. In Wilde's own words, the parties' arrangement was intended to "function as a partnership whereby Wilde would bring its proprietary and novel processes and equipment to Monogram's facility in Martinsville,

Virginia, and the two would work together to develop a cost-efficient, profitable system for mass production of Wilde's chicken chips." (Def.'s Br. at 3.) Wilde employees worked on the production line alongside Monogram employees. (Wright Dep. at 41:13–19.) For a period of time, Wilde originally ordered the meat logs (the primary ingredient that is sliced and fried to create the chicken chips) and provided them to Monogram to produce the chips. (*Id.* at 43:8–14.) Monogram has similar co-manufacturing agreements with other snack companies and they operate under a similar structure—the company provides the process (and in some cases the ingredients and equipment) and Monogram provides the workforce and equipment to scale up production.

The record demonstrates that Wilde enlisted Monogram's services and work force to mass produce its chicken chips. The predominant purpose of this kind of contract is the provision of services. Therefore, the Virginia statute of frauds does not apply to render the contract unenforceable.

The court finds that Monogram has demonstrated that there remain genuine issues of material fact as to whether Wilde breached its contract with Monogram. Wilde's motion for summary judgment will be denied as to this count.

## B. Unjust Enrichment

Monogram concedes that it cannot recover under both a breach of contract claim and an unjust enrichment claim. But it contends that it may still proceed under both claims, pleading unjust enrichment as an alternative to breach of contract.[2] Wilde raises three main

---

[2] District courts in this circuit have repeatedly held that a plaintiff is not barred from pleading an unjust enrichment claim as an alternative "where the existence of a contract concerning the subject matter is in dispute." *Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20cv00042, 2021 WL 3856459, at *13 (W.D. Va.

arguments in support of its motion for summary judgment on Monogram's unjust enrichment claim: (1) that Monogram did not confer a benefit upon Wilde because it has retained the 176 pallets of unpaid-for product, meaning Wilde was not unjustly enriched; (2) that Monogram acted in bad faith, thereby forfeiting any right to an equitable remedy; and (3) that Monogram cannot proceed on its unjust enrichment claim if its breach of contract claim survives summary judgment.

Unjust enrichment is a quasi-contract claim that permits recovery, "where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Swedish Civ. Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) (citation omitted).  The elements for unjust enrichment are: "(1) [the plaintiff] conferred a benefit on [the defendant], (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *T. Musgrove Constr. Co. v. Young*, 840 S.E.2d 337, 341 (Va. 2020). A plaintiff's recovery on an unjust enrichment claim "is limited to the benefit realized and retained by the defendant." *Id.*

The Supreme Court of Virginia has recently noted an important distinction between unjust enrichment and the related (but here unpleaded) quasi-contractual cause of action of *quantum meruit*. *See id.* The Court noted that a plaintiff can recover based on *quantum meruit* when the plaintiff completes work at the defendant's request, but the parties do not agree on

---

Aug. 30, 2021); *Chubb & Sun v. C & C Complete Servs., LLC*, 919 F. Supp. 2d at 666, 678 (D. Md. 2013) (citation omitted); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) ("[A]lthough [the plaintiff] may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute.").

the proper compensation for those services. *See id.* On the other hand, "*when the defendant has not requested the plaintiff's services*, a plaintiff's claim is for unjust enrichment." *Id.* (emphasis added).

The record evidence in this case makes clear that Wilde requested Monogram's services. (*See* Ans. ¶ 3 ("[Wilde] admits it entered a series of arrangements with [Monogram] . . .") Extensive deposition testimony on both sides describes a co-manufacturing relationship lasting over two years where Wilde would make numerous requests for Monogram's production services and Monogram would fulfill those requests. Monogram did not provide unrequested services to Wilde. This precludes Monogram's claim for unjust enrichment. *See T. Musgrove Constr.*, 840 S.E.2d at 341. And, while a claim of *quantum meruit* might survive summary judgment on these facts, Monogram has not raised that claim before this court.[3] (*See* Amend. Compl. ¶¶ 25–39.)

Finding no genuine dispute of material fact as to this issue, and noting that Monogram's breach of contract claim will survive summary judgment, the court will grant Wilde's motion for summary judgment on  Monogram's unjust enrichment claim.

## C. Misappropriation of Trade Secrets

Monogram asks the court to grant summary judgment on Count IV of Wilde's counterclaim, misappropriation of trade secrets. Wilde claims that its production process—including its patent-pending fryer belt—is a trade secret entitled to protection. According to Wilde, Monogram disclosed these trade secrets to its competitors, Tyson and Conagra, who also operated manufacturing lines at the Martinsville facility. Monogram contends that

---

[3] Accordingly, Monogram will not be able to pursue this alternative theory of an implied contract at trial.

summary judgment on this claim is appropriate for two reasons: (1) Wilde has not taken reasonable steps to ensure the secrecy of its alleged trade secrets; and, (2) even if it had, the undisputed facts show that Monogram did not misappropriate any of those trade secrets.

Under the Defend Trade Secrets Act ("DTSA"), a trade-secret owner may bring a civil action in federal court if a trade secret is "misappropriated" and "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *see Bonumose Biochem, LLC v. Yi-Heng Percival Zhang*, No. 3:17-cv-00033, 2018 WL 10069553, at *6 (W.D. Va. May 21, 2018), *report and recommendation adopted*, 2018 WL 10068672. To succeed on a claim under DTSA, a plaintiff must prove that (1) it owns a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate or foreign commerce. *Bonumose*, 2018 WL 10069553, at *6.   Similarly, the Virginia Uniform Trade Secrets Act ("VUTSA") requires a plaintiff to prove (1) the information in question constitutes a trade secret and (2) the defendant misappropriated the trade secret. *Darton Env't, Inc. v. FJUVO Collections, LLC*, 332 F. Supp. 3d 1022, 1036–37 (W.D. Va. 2018). "Trade secret claims survive summary judgment only if supported by actual objective evidence, not mere inferences." *OSI Sys., Inc. v. KM-Logix, LLC*, 2021 WL 5987905, at *2 (E.D. Va. Dec. 17, 2021) (citing *Othentec, Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008)).

### 1.  Existence of a Trade Secret

Monogram argues as a threshold matter that Wilde has not adequately alleged the existence of a trade secret. The DTSA defines a "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,

> whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The VUTSA defines a trade secret as

> information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336.

The parties dispute exactly what constitutes the alleged "trade secret" in this case. In Wilde's view, its trade secret consists of "the recipe, specifications, manufacturing process, and assets used by Wilde to make its chicken chips." (Def.'s Br. Opp'n Mot. Summ. J. at 13 [ECF No. 94].) In Monogram's view, Wilde's trade secrets are confined to the "top belt of the fryer and the temperature of the meat logs." (Pl.'s Reply at 1 [ECF No. 97].) Viewing the record in the light most favorable to Wilde, the court finds that the record supports Wilde's broader conception of its trade secret.

The NDA, signed by both parties, defines "Confidential Information" as "all information . . . supplied by either party to the other party . . . including . . . information concerning each party's business, products, recipes, specifications, manufacturing processes, financial positions, operations, assets, and liabilities." (ECF No. 85-2, at 1.) This agreement indicates that Wilde considered its products, recipes, specifications, and manufacturing processes proprietary. When asked what information he would need to manufacture Wilde's chicken chip, Danny Alahakoon, Monogram's Director of Research and Development, testified that he "would need their formulation; processing information for the logs, slice thickness; cooking times or parameters on that process; seasoning . . . that is used for the specific product and rate of application." (Dep. of Dhanushka ("Danny") Alahakoon 92:13–25, Oct. 21, 2021 [ECF No. 115].) During their relationship Wright shared the recipe and specifications for producing the chicken chips with Alahakoon, who knew that he was not allowed to share that information with any other Monogram customers. (*Id.* at 60:10–61:21; 68:8–23.) The court finds that these descriptions support a broad interpretation of Wilde's trade secret.[4] Wilde's chicken chip recipe, specifications, and manufacturing process qualify as subject matter that "derives independent economic value" from not being "generally known" or "readily ascertainable" such that it is the type of information trade secret laws protect. *See* 18 U.S.C. § 1839(3); Va. Code Ann. § 59.1-336; *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F.

---

[4] Monogram clings to a passing remark by Wright in his deposition to support its assertion that the fryer belt is the primary trade secret. When discussing the portion of the NDA that references the "manufacturing process" Wright stated, "We're specifically talking about the top belt. We're specifically talking about showing that trade secret, the one that we filed a patent on." (Wright Dep. at 126:17–21.) The court finds that, in the light most favorable to Wilde, this statement indicates that the fryer belt is among the components of its trade secret, but it does not foreclose that other specifications and processes also comprise the trade secret.

Supp. 2d 396, 416 (E.D. Va. 2004) ("The case law is clear that just about anything can constitute a trade secret under the right set of facts.").

Monogram next argues that Wilde did not take sufficient action to protect the secrecy of its production processes. A trade secret holder must take "reasonable efforts" to maintain secrecy. *MicroStrategy*, 331 F. Supp. 2d at 416. "Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts." *Id.* Disclosing information to outside parties does not result in the automatic loss of trade secret status, provided that "the disclosure is made in confidence, express or implied." *Id.*

In Monogram's view, the only action Wilde took to protect the secrecy of its alleged proprietary process was to have the company sign an NDA on May 9, 2017. The NDA required that Monogram and its "employees, agents, representatives and consultants who are given access to Confidential Information" keep proprietary information secret, not disclose that information to unauthorized persons, and "use at least the same degree of care to protect the information as the recipient uses with its own confidential information." (ECF No. 85-2, at 2.) In addition to this NDA, the record establishes that Wilde received assurances from Monogram personnel that the company takes the protection of trade secrets seriously. (*See* Wright Dep. at 25:24–26:3 ("I really was adamant about protecting our equipment. And I was assured that . . . they keep every trade secret secret."); *see also* Dep. of Pat Strickland 75:12–14, Nov. 3, 2021 [ECF No. 116] ("We also understand that we want to protect the integrity and the process of each of those manufacturing partners.").)

Monogram argues that Wilde did not use reasonable efforts to maintain the secrecy of its trade secrets because it shared manufacturing space with other customers—most

19

importantly, Tyson—and that its operations could be seen from a public hallway. But little, if any, of Wilde's proprietary processes can be ascertained from simply viewing the manufacturing line in action in that shared space. The fryer features a hood that encloses the custom-made fryer belt when it is in operation. (Wright Dep. at 120:10–121:13; Alahakoon Dep. at 82:6–18.) And Wilde's meat logs are made off-site, so the recipe is not available to Monogram's other on-site partners. (Wright Dep. at 43:8–14.)

For these reasons, Wilde's NDA with Monogram establishes that Wilde took reasonable efforts to maintain the secrecy of its trade secrets.[5] Wilde has therefore demonstrated that it owned a valid trade secret.

### 2. Misappropriation

Monogram succeeds, however, on its argument that the record evidence does not contain any genuine dispute of material fact as to whether it misappropriated Wilde's trade secrets. Wilde specifically alleges that Monogram "failed to use at least a reasonable degree of care to protect Wilde's trade secrets" and disclosed its trade secret information to its competitors (Conagra and Tyson). (*See* Amend. Counterclaim ¶¶ 81–83.)

DTSA and VUTSA provide nearly identical definitions of "misappropriation" insofar as those definitions are relevant to this case: "[D]isclosure or use of a trade secret of another

---

[5] Wilde applied for a patent on its fryer belt on May 31, 2018, and this patent application became a public record on the U.S. Patent and Trade Office webpage on December 5, 2019. (ECF No. 88-3.) Monogram emphasizes that the fryer belt cannot be a trade secret because it is now a public record. The court notes, however, that the fryer belt became public information *after* Wilde terminated its business relationship with Monogram on October 31, 2019—in other words, after Monogram allegedly misappropriated Wilde's trade secrets. (*See* ECF No. 94-9.) The patent application was therefore not a public record during the relevant time period and this argument is unavailing. *Cf. Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1329–30 (Fed. Cir. 2013) ("As a matter of law, any specifications . . . disclosed in or ascertainable from the asserted patents became publicly available in October 2005 when . . . the patent application was published and, as such, could not constitute a trade secret in early 2006 when Leggett is alleged to have engaged in misappropriation.").

without express or implied consent by a person who . . . at the time of disclose or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit the use of the trade secret . . . ." 18 U.S.C. § 1839(5); *see* Va. Code Ann. § 59.1-336. "While circumstantial evidence is often necessary in trade secrets cases, Rule 56 of the Federal Rules of Civil Procedure and the Due Process Clause place a limit on which inferences can be drawn from circumstantial evidence. A trade secrets theft case fails when a plaintiff cannot demonstrate a chronological, plausible explanation for its allegations." *OSI Systems*, 2021 WL 5987905 at *3 (citing *Trident Perfusion Assocs., Inc. v. Lesnoft*, 121 F.3d 700 (4th Cir. 1997)). "Mere speculation . . . is not enough to sustain [a party's] misappropriation claim." *Id.*

Wilde highlights three primary instances where it believes Monogram disclosed its alleged trade secrets to competitors; all ask the court to make a number of inferential leaps that are unsupported by the record. First, Conagra personnel allegedly entered the meat-slicing room on one occasion, accompanied by a Monogram employee, when Wilde personnel were slicing meat logs. (Wright Dep. at 115:10–22.) Importantly, Monogram's meat slicing room is not designated solely for Wilde's use. (*See id.*) According to Wilde, Conagra would have noticed the temperate of the slicing room, which Wilde has chosen uniquely to produce its chicken chips and alleges is part of the key to a successful product. (*See id.*) But even Wright himself acknowledges that he did not realize the potential importance or impact of Conagra personnel walking into that room until later. (*See id.* at 115:20–22.) In the court's view this incident falls well short of what is required for a company to misappropriate another's trade secrets. When the holder of the trade secret fails to realize, at the time of an incident, that a piece of its

proprietary information (the ambient temperature of the slicing room) might be discoverable, Monogram can hardly be charged with that knowledge.

Second, Wilde alleges that "bankers" saw its fryer running while on a tour of the Monogram facility. (*Id.* at 119:18–25.) Wilde had told Monogram to shut down Wilde's production line for the remainder of the week when the tour was scheduled because they did not have enough meat logs to run the production line for a full day. (ECF No. 94-8.) Despite this, e-mail correspondence indicates that Monogram employees ran Wilde's production line for a corporate tour without Wilde's consent. (*See id.*) But as noted above, simply viewing Wilde's production area while running does not reveal its proprietary process—particularly as the fryer belt is shielded from view when the hood is closed and Wilde's fryer could not have run with the hood open. (*See* Wright Dep. at 120:10–121:13; Alahakoon Dep. at 82:6–18.).)

Wilde's third, and strongest, allegation pertains to Tyson, the company that produced a meat jerky product in the same room in the Martinsville facility that Wilde produced its chicken chip. Besides Wilde, Tyson is the only other snack food manufacturer known to have produced and sold a chicken chip.[6] (Wright Dep. at 122:7–123:12.) While this initially raises suspicions that perhaps Tyson obtained some of Wilde's proprietary information, closer scrutiny of the timeline of events defeats those suspicions. More importantly, the timeline does not support an inference that *Monogram* shared any of Wilde's proprietary information with Tyson.

---

[6] Tyson produced a jerky product in the Martinsville facility. (Wright Dep. at 25:6–14.) Its chicken chip was produced elsewhere.

Wilde began co-manufacturing with Monogram around May 2017. (*Id.* at 24:25–25:3.) In May 2018, Wes Jackson told Wright that Tyson would be making a chip made of chicken "with or without" him and suggested that Wright have a conversation about partnering with Tyson. (*Id.* at 122:15–21.) Wright declined. (*Id.*) On May 31, 2018, Tyson officially announced its new chicken chips.[7] Fundraising campaigns launched around the same time featured videos of people taste-testing the chips.[8] An e-mail from a Tyson representative to Wes around July 19, 2018, indicated that Tyson attempted to set up a meeting with Wilde "to have a general discussion on a potential partnership on leveraging equipment to produc[e] chicken chips." (ECF No. 94-7.) Based on Wright's testimony, it does not appear he ever met with Tyson for this purpose. (Wright Dep. at 122:15–21.)

Wright and Barnoud both testified that, late one evening, Tyson representatives walked into Wilde's production area at the Martinsville facility, accompanied by Ches Jackson. (Wright Dep. at 117:15–118:7; Barnoud Dep. at 17:7–23.) At that time ordinarily no one would be present, but Wright and Barnoud happened to be there. (*See* Wright Dep. at 117:19–24.) The hood on Wilde's fryer was down at the time. (*Id.* at 118:22–23 ("The hood was down, and the hood was there to protect everything inside.".) Exactly when this incident occurred is unclear, but Barnoud's presence indicates that it was after August or September 2018 when he

---

[7] *Tyson Innovation Lab Launches ¡Yappah! Brand to Help Fight Food Waste Through a Unique Chef-Driven Lens*, Tyson (May 31, 2018), *available at* https://www.tysonfoods.com/news/news-releases/2018/5/tyson-innovation-lab-launches-yappah-brand-help-fight-food-waste-through (last visited Jan. 19, 2022).

[8] *¡Yappah! Protein Crisps: Rethinking Snacks, For Good*, IndieGoGo (May 30, 2018), *available at* https://www.indiegogo.com/projects/yappah-protein-crisps-rethinking-snacks-for-good# (last visited Jan. 19, 2022).

was hired. (*Id.* at 41:17–42:13; Barnoud Dep. at 11:6–8.) In October 2018, Tyson's chicken chips hit the market.[9]

The court cannot conclude that this series of events raises a genuine dispute of material fact that Monogram misappropriated Wilde's trade secrets. This thin evidence does not provide a "chronological, plausible explanation" for Wilde's allegations. *See OSI Systems*, 2021 WL 5987905 at *3. It requires the court to draw too many unsupported inferences. *See id.* ("Mere speculation . . . is not enough to sustain [a party's] misappropriation claim."). The undisputed facts show that Tyson had already created its chicken chip by May 31, 2018, because people were taste testing them. This is before Monogram attempted to convince Wilde to partner with Tyson, and well before Ches Jackson escorted Tyson representatives over to Wilde's production area. Importantly, Tyson is not the party Wilde is accusing of misappropriation of its trade secrets—the dispute is between Monogram and Wilde. This record is insufficient to create a genuine dispute of material fact that Monogram disclosed any of Wilde's trade secrets to Tyson or any other competitors.

The remainder of the record evidence overwhelmingly supports Monogram's position that it did not share Wilde's trade secrets with competitors or otherwise misappropriate those secrets. Conagra representative George Barton testified that he "was aware that Wilde production was being produced over there, but nobody walked [him] over to the equipment and showed [him] the process." (Dep. of George Barton 6:8–10, July 27, 2021 [ECF No. 88-5].) In advance of Tyson's and Wilde's leadership visiting the Monogram facility on the same

---

[9] *¡Yappah! Brand Continues to Bring Partners Together to Join the Fight Against Food Waste with Kickstarter Launch*, Tyson (Sept. 26, 2018), *available at* https://www.tysonfoods.com/news/news-releases/2018/9/yappah-brand-continues-bring-partners-together-join-fight-against-food (last visited Jan. 19, 2022).

day, Monogram supervisor Pat Strickland sent an e-mail to his staff that read: "Our . . . customers will be working in close proximity to each other so it is important to provide separate work spaces and for us to understand the need to honor confidentiality and be aware of who may be within hearing of our conversations." (ECF No. 94-4.) And both Alahakoon and Strickland repeatedly testified that they never shared what they knew of Wilde's proprietary information with anyone outside of Monogram. (*See* Strickland Dep. at 80:2–16; Alahakoon Dep. at 62:24–63:24, 68:4–23, 84:6–85:5.)

Because Wilde has not shown a genuine dispute of material fact as to whether Monogram misappropriated Wilde's trade secrets, the court will grant Monogram's motion for summary judgment on this claim.

## IV.   CONCLUSION

For the above reasons, the court will grant in part and deny in part Wilde's motion for summary judgment and grant Monogram's motion for partial summary judgment. This matter will proceed to trial on Monogram's single count of breach of contract and Wilde's counterclaims for conversion (Count I), unjust enrichment (Count II), and breach of contract (Count III). The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 20th day of January, 2022.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE